IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CHRISTOPHER GOODVINE,

                    Plaintiff,                              OPINION AND ORDER

          v.                                               14-cv-278-wmc
                                                           15-cv-146-wmc

MICHAEL MEISNER, *et al.*,

                    Defendants.

---

This case is on remand from the Court of Appeals for the Seventh Circuit to screen *pro se* plaintiff Christopher Goodvine's claims in this lawsuit challenging conditions in segregation at Columbia Correctional Institution ("CCI"). Goodvine alleges that CCI knowingly employed flawed policies and practices in handling inmates with mental illness who spent significant periods of time in segregation, including himself.

In an order dated July 28, 2015, the court raised several procedural issues that may affect the claims to be screened. (Dkt. #49.) Specifically, the court noted that:

(1)     Goodvine had recently settled another lawsuit with the state arising from conditions in segregation at CCI. *Goodvine v. Meisner*, No. 12-cv-134-wmc (W.D. Wis.). The court was not privy to the details of the settlement, but it may be that the settlement precludes some or all of the claims made in the amended complaint in this case.

(2)     Goodvine had filed a new lawsuit against prison staff at Columbia regarding conditions of segregation and treatment of his mental illness. *Goodvine v. Meisner*, No. 15-cv-146-wmc (W.D. Wis.). That case has not yet been screened pursuant to 28 U.S.C. § 1915A, but a review of the complaint reveals that at least some of the claims appear to be the same or similar to those raised in the amended complaint in this case, as do some of the defendants, making it likely that these two cases should be consolidated.

1

     (3)     Goodvine is no longer in the custody of the Department of Corrections, meaning that his claims for injunctive relief are likely moot.

In light of these developments, the court directed Goodvine to file a second amended complaint that addressed these three issues, was more streamlined and identified the specific claims on which he wished to proceed in this lawsuit.  Goodvine responded on August 10, 2015, stating that he would like to consolidate the claims in cases 14-cv-278 and 15-cv-146, but he could not file an amended complaint at this time because:  (1) his claims are complex; (2) he has limited access to his case materials, many of which were destroyed when he was transferred from CCI; and (3) he was working full-time outside of the county jail and did not have adequate resources or time to conduct the research necessary to respond to the court's order.  (Dkts. ##50, 51.) Goodvine further requests assistance in recruiting counsel for the same reasons, and represents that he already contacted multiple lawyers, all of whom refused to represent him.  (Dkt. #51.)  Finally, Goodvine filed a motion to stay this case to allow him to pursue settlement of his claims with defendants, as well as focus on his transition back into the community.  (Dkt. #53.)   The court addresses each of these matters below.

OPINION

## I.    **Goodvine's Motion to Stay.**

Goodvine's motion to stay was based on his admirable desire to settle this litigation and focus on working and transitioning from incarceration back into society.

Unfortunately, the court received notice that Goodvine had been taken back into DOC custody on new criminal charges in October 2015 and is currently incarcerated at the Milwaukee Secure Detention Facility.  (Dkt. #56.)  Obviously, Goodvine's arrest and incarceration not only affects his priorities, but may also impact his desire to litigate these cases.  Still, having initiated these lawsuits, Goodvine has an obligation to prosecute them.  Indeed, one of these cases has been pending for more than a year and has already been to the court of appeals; the other case is several months old.  Neither case has advanced past the screening stage.  The court is, therefore, disinclined to grant a stay that would delay progression of these cases any further.  Accordingly, although the court agrees with Goodvine that the parties should consider mediation at the appropriate time -- and will help recruit counsel for at least this limited purpose -- the court will not stay the cases for this purpose alone.


## II.      Goodvine's Motion for Assistance Recruiting Counsel.

As Goodvine suggests in his motion requesting recruitment of counsel, the process of sorting out his claims, and ultimately litigating or mediating this case, would be simpler if the court were able to recruit counsel for him.  However, counsel would be helpful in nearly every case involving a *pro se* litigant.  Moreover, some of the particular impediments Goodvine cites, such as being busy, are not unique to him.  Many *pro se* litigants, as well as many lawyers, are busy, but that is not sufficient reason to appoint counsel.

The reality is that there are not enough lawyers available and willing to represent all of the *pro se* litigants who would benefit from the assistance of counsel. The court must, therefore, exercise discretion in deciding whether assistance recruiting counsel is necessary in a particular case. In doing so, the court considers whether the legal and factual difficulty of this case exceeds the litigant's ability to litigate it. *Pruitt v. Mot*e, 503 F.3d 647, 654, 653-56 (7th Cir. 2007).

Goodvine's claims are complex, in that he has challenged a range of prison policies applying to mentally-ill inmates in segregation, as well as several specific instances in which defendants allegedly failed to provide him adequate mental health treatment and failed to intervene to protect him from harming himself. His claims will likely require significant discovery, and he will likely need the testimony of experts to prove some of his claims. Such considerations weigh in favor of recruiting counsel in this case.

In contrast to many *pro se* litigants, however, Goodvine is an experienced and competent litigator who has litigated these types of claims before. His pleadings in these cases reflect that he understands the applicable legal standards. His pleadings are also clear and easy to understand, and he has paired allegations appropriately with specific defendants and specific legal theories. Goodvine further understands court procedures and has demonstrated an understanding of the rules of evidence and civil procedure. Indeed, he succeeded in challenging this court's dismissal of his claims in Case No. 14-cv-278 on appeal. Such considerations suggest that Goodvine has the ability to litigate this case on his own, at least during the early stages of the case.

After weighing all of the relevant factors, the court concludes that it is not necessary to recruit counsel before the screening stage.   The court is dismissing several of Goodvine's claims as moot in light of his transfer from CCI, and it may be that other claims will be dismissed as barred by the settlement agreement in Case No. 12-cv-134-wmc.   Additionally, some claims may be dismissed at the motion to dismiss stage on exhaustion grounds or as barred by issue or claim preclusion based on court decisions in related cases.

Until the scope of this case is clearer, the court is disinclined to recruit counsel, particularly where Goodvine possesses the knowledge to decide which claims to pursue. Like other busy litigants and lawyers, Goodvine must decide for himself how to prioritize this case among all of the other important activities in his life.

All that being said, Goodvine may renew his motion for assistance in recruiting counsel if at any point in this case exceeds his capacity to litigate it.   In particular, should defendants join in Goodvine's request for an early mediation, the court would recruit counsel for that limited purpose.   Moreover, if this case proceeds to summary judgment or trial, the court will likely consider recruiting counsel for Goodvine *sua sponte*.


III.   **Consolidation and Screening of Cases Nos. 14-cv-278-wmc and 15-cv-146-wmc.**

Turning to the pleadings in cases 14-cv-278 and 15-cv-146, the court agrees with Goodvine that the claims he raises in both cases are substantially related and should be consolidated.   Although it would have been helpful if Goodvine had filed an amended

complaint to consolidate and streamline the claims, the court is sympathetic to Goodvine's explanation that drafting an amended complaint at this time would be difficult for him.   Nevertheless, it remains necessary to determine whether any of Goodvine's claims are moot based on his changed circumstances.

As mentioned, all of Goodvine's allegations concern prison policies and practices relating to mentally ill inmates who are held in segregation at CCI.   The allegations in his complaints can be grouped into three categories:   (1) CCI security policies and practices fail to protect mentally ill inmates from harming themselves when housed in segregation; (2) CCI fails to provide adequate mental health treatment for inmates in segregation, subjecting inmates instead to conditions that exacerbate their mental illness; and (3) on several, specific occasions, various individual defendants failed to respond appropriately to Goodvine's threats of self-harm.   Goodvine asserts claims for this alleged misconduct under the Eighth Amendment, as well as under state negligence and malpractice law.

As discussed below, the court will permit Goodvine to proceed on several of his claims, but several defendants will be dismissed from the case because Goodvine's allegations do not state any claim for relief against them.   Additionally, Goodvine has failed to provide any reason that he should be permitted to proceed on his numerous claims for specific injunctive relief in the form of policy changes at CCI, now that he is no longer in DOC custody at CCI.   Those claims will, therefore, be dismissed as moot unless Goodvine advises within fourteen (14) days of any good grounds to proceed.

**A.      Policies Relating to Mentally Ill Inmates Housed in Segregation.**

Goodvine alleges that several of the defendants should be liable for implementing or enforcing deficient policies and practices relating to mentally ill inmates housed in segregation.   Specifically, he alleges that the following defendants were aware that mentally ill inmates housed in segregation frequently engage in self-destructive behavior and that these defendants had the ability to make or recommend needed changes to policies to reduce this behavior, but failed to do so:   Ed Wall (DOC secretary), Michael Meisner and Michael Dittman (wardens of CCI), Hautamaki (deputy warden), Janel Nickel and Lucas Weber (security directors), Michael Morrison (DS-1 unit security supervisor), and David Melby (DS-1 unit manager).   Goodvine also alleges that several other defendants responsible for mental health care of inmates should have recommended policy and training changes, including:   Dr. Laurent, Dr. Wood, Dr. Buhr, Dr. Norge (psychologists); Dr. Maier (DS-1 unit psychiatrist); and Karen Anderson (health services manager).

Goodvine further alleges that instead of making policy modifications that would have protected inmates from self-harm, these defendants allowed the prison to operate pursuant to the following flawed practices that worsened Goodvine's and other inmates' mental illness and increased their risk of self-harm:

- Mentally ill inmates are not screened by security staff before they are transferred to segregation to determine whether certain restrictions or requirements should be imposed, such as restrictions on receiving medications in solid form, receiving metal or sharp objects, or for needing to be placed on "direct observation" status.

- Mentally ill inmates are not monitored regularly by correctional officers after they are placed in segregation.

- Guards are not systematically notified that certain inmates have self-harm propensities and must be monitored closely.   In particular, defendants were aware that Goodvine often harmed himself while in segregation or on observation status, but failed to warn or train guards about his behavior.

- Even when guards know that an inmate has self-harm propensities, they are not routinely trained to handle such inmates.   While on observation, guards do not know how to handle inmates who hide medications, smuggle objects to cut with, or conceal cutting activity.   For example, they are not trained to crush or liquefy medications, nor monitor someone on observation properly.

- Policies allow guards to distribute medications, even though they regularly distribute the wrong medications or dosages, fail to ensure that inmates actually take their medications, and fail to report when an inmate refuses to do so.

- Guards are not disciplined when their actions result in serious injuries to mentally ill inmates.

- Inmates are not placed on observation status unless they are deemed to be in "obvious distress."

- Restraints, full-body suits or padded cells are used only after inmates have harmed themselves, rather than using these options to prevent an inmate from harming himself.

- There are no emergency call buttons in the segregation cells.

- Inmates in segregation were deprived of property, clothing, books, papers, magazines, photos and all other forms of sensory stimulation, which results in exacerbation of their mental health problems.

These allegations are certainly sufficient to state a claim upon which relief may be granted under the Eighth Amendment.   Prison officials have a well-established duty under the Eighth Amendment to protect prisoners from harming themselves as a result of

8

a mental illness. *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010); *Cavalieri v. Shepard*, 321 F.3d 616 (7th Cir. 2003). A prison official violates that duty if he or she is aware of but disregards a substantial risk that the plaintiff would seriously harm himself by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825 (1994).

Although a supervisor such as the DOC Secretary or warden may not be held vicariously liable under § 1983 for the conduct of a subordinate (such as an individual correctional officer), a supervisor can also be held liable if, "with knowledge of the subordinate's conduct, [he or she] approves of the conduct and the basis for it." *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 477 (7th Cir. 1997); *see also Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). A supervisor can also be held liable if flawed policies or deficient training, over which the supervisor had control, amount to deliberate indifference to the rights of persons affected by the policies or inadequate training. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) (discussing this claim in the context of municipal liability).

Here, Goodvine alleges that supervisory officials at the DOC generally, and at CCI in particular, failed (1) to correct obviously deficient policies and (2) to supervise or discipline officers who they knew displayed deliberate indifference while performing duties in the segregation units at CCI. Goodvine further contends that he suffered personal harm as the result of these deficient policies and failures to supervisor and train officers. Although Goodvine does not identify their specific roles or state the extent to

which each defendant is individually responsible for creating policies or for supervising or training officers who reportedly failed to protect him from self-harm, Goodvine's allegations are sufficient at this early stage of the litigation to proceed with Eighth Amendment claims against Wall, Meisner, Dittman, Hautamaki, Nickel, Weber, Morrison, Melby, Laurent, Wood, Buhr, Norge, Maier and Anderson.   According to Goodvine's allegations, these defendants in particular were responsible for the policies, as well as the training and supervision, that amounted to deliberate indifference to Goodvine's safety and the safety of other mentally ill inmates housed at CCI.

### B.      Mental Health Treatment for Inmates in Segregation.

In addition to his challenges to CCI's security policies and practices, Goodvine alleges that CCI failed to provide adequate mental health care to him and other inmates in segregation who suffered from severe mental illness and the compulsion to self-harm. Goodvine alleges that several defendants were aware that many of the inmates in segregation had mental health needs and regularly engaged in self-harm.   Nonetheless, defendants persisted in employing or endorsing treatments and practices that were inadequate or counterproductive, including the following:

- CCI did not routinely identify treatment needs or goals for mentally ill prisoners in segregation.

- Inmates in segregation were not permitted to participate in mental health therapy groups, talk therapy or "dialectical behavior therapy."   Instead, the only therapy available is a program called "coping skills," which he alleges was both ineffective and exacerbated his mental illness and risk of self-harm and suicide.

Under the Eighth Amendment, prisoners have a right to receive adequate medical care, *Estelle v. Gamble*, 429 U.S. 97 (1976), which includes a right to appropriate mental health treatment.  *Rice ex. Rel. Rice v. Correctional Medical Servs.*, 675 F.3d 650, 665 (7th Cir. 2012).   To establish deliberate indifference under the Eighth Amendment on a denial of medical care claim, the plaintiff must demonstrate that the defendants:   (1) were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn; and (2) actually drew an inference that such potential for harm existed.  *Farmer*, 511 U.S. at 837.

Under this standard, Goodvine's allegations are at least sufficient to state an Eighth Amendment claim for purposes of notice pleading against defendants Ankarlo, Laurent, Wood, Buhr, Norge, Maier and Anderson for denial of adequate mental health treatment.   Goodvine's allegations also permit an inference that these mental health professionals were responsible for recommending and implementing policies regarding treatment of inmates in segregation, as well as that the deficient policies caused Goodvine to suffer particular harm (discussed in detail in Part C).   His allegations do not, however, permit an inference that any other of the named defendants had the knowledge or expertise to make treatment decisions.

### C.    Goodvine's Acts of Self-Harm.

In addition to Goodvine's allegations and claims challenging security and mental health treatment policies, Goodvine includes allegations regarding several, specific

11

instances when prison staff allegedly failed to respond adequately to a serious risk that he would harm himself.   Before turning to Goodvine's specific allegations, however, a preliminary question must be addressed:   whether including all of these various specific instances in a single lawsuit violates Fed. R. Civ. P. 20.   Rule 20 prohibits a plaintiff from asserting unrelated claims against different defendants or sets of defendants in the same lawsuit.   Multiple defendants may not be joined in a single action unless (1) the plaintiff asserts at least one claim for relief against each defendant that arises out of the same transaction or occurrence or series of transactions or occurrences; and (2) presents questions of law or fact common to all.   *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007).

Goodvine's complaint arguably violates Rule 20 because it includes multiple claims about different events and different prison officials that occurred over a span of nearly three years.   On the other hand, while Goodvine includes allegations regarding numerous specific instances in which he suffered harm, the primary focus of both complaints is on the allegedly flawed policies and practices that *allowed* or *caused* the specific instances of harm to occur.   Moreover, unlike in many prisoner lawsuits in which a plaintiff attempts to connect unrelated events through allegations of conspiracy or unlawful policies, Goodvine's pleadings contain a detailed and plausible explanation of how CCI's policies and practices caused, or at least contributed to, the specific instances of harm.   Under these circumstances, the court concludes that Rule 20 does not bar Goodvine from proceeding with his numerous failure-to-protect claims within this lawsuit.

12

As previously discussed, the question in these failure-to-protect claims is whether the particular official involved was aware of a substantial risk that the plaintiff would seriously harm himself, but disregarded that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 832. Liability under the deliberate-indifference standard also requires more than mere negligence, gross negligence or recklessness; it is satisfied only by conduct that approaches intentional wrongdoing (*i.e.*, "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result"). *Id.* at 835.

Applying this standard, Goodvine's allegations are sufficient to state a claim against defendants Officers Schwebke, Neumaier, Casiana, Schneider, Risen, Albright, Delmore, Fisher, Pitzen, Quade, Jordan, Kratz, Conroy, Gavinski, Miller, Gerry, Kottka, Exner, Wolf and Fanara, based on the following allegations.

### 1.    December 6, 2011.

On this date, Goodvine was in segregation. Dr. Ankarlo, the DOC's chief psychologist, had ordered that Goodvine be on "direct observation" status, meaning that guards were required to maintain a constant line-of-sight on him. However, Officer Schwebke allegedly refused to approve direct observation status for Goodvine. Goodvine lacerated his right arm so severely that he had to be taken to the local emergency room for treatment. Around the same time, Goodvine overdosed on medication he had been allowed to purchase from canteen.

      2.      **February and May 2012.**

In February and May 2012, Officer Neumaier gave Goodvine large and potentially fatal doses of medication without ensuring that he consumed them.   The officer then told Goodvine he did not care if he overdosed and killed himself.   Goodvine stockpiled the medications and later overdosed.

      3.      **October 18, 2012.**

On this date, Goodvine tied cloth around his neck and told Officer Casiana that he would harm himself and needed to be placed on observation.   Casiana told Goodvine observation was "not on the table" and left.   Officer Schneider later learned that Goodvine had metal in his cell, but did nothing.   Eventually, Goodvine lacerated his arm, resulting in massive blood loss.   He required surgery and a blood transfusion.

      4.      **November 30, 2012.**

On this date, Goodvine was in observation because of suicidal behavior.   Officers Risen and Albright were responsible for monitoring him, but failed to do so.   He lacerated his arm severely.

      5.      **January 7, 2013.**

Goodvine told Officers Delmore and Fisher during meal delivery that he was suicidal and needed to go on observation status.   He told them he would begin cutting himself if he did not receive help.   The officers did nothing and Goodvine cut himself. He was transferred to the local emergency room for treatment.

6.   **June 1, 2013.**

On this date, Goodvine was on observation status and told Lt. Pitzen and Officer Quade that he was going to harm himself.  He asked to be placed in restraints.  Aware that Goodvine had the means to harm himself, they still did nothing.  Goodvine lacerated his arm and was sent to the emergency room for treatment.  On that same day, Officer Delmore was charged with maintaining a direct line-of-sight on Goodvine while he was on observation status, but was instead doing a Sudoku puzzle or was otherwise absent. Goodvine seriously injured himself.

7.   **July 16, 2013.**

On this date, Goodvine was on observation status and Officer Jordan was charged with monitoring him.   Goodvine told Jordan that he was going to harm himself as soon as Jordan stopped watching him.   Jordan then stopped watching Goodvine for more than an hour and Goodvine lacerated his arm severely.

8.   **February 19, 2014.**

On this date, Goodvine told Officer Kratz that he was imminently suicidal and would engage in self-harm and cutting if not placed on observation.  When Kratz told Officer Conroy, he said, "fuck Goodvine."   Goodvine then cut himself.

9.   **March 1 and 2, 2014.**

On this date, Goodvine was on observation status when he told Lt. Miller that he would kill himself and had the means to do so.  Miller did nothing and Goodvine proceeded to harm himself.  The next day, Goodvine was again on observation with

Officer Gavinski supposed to maintain a direct line of sight on him.  Instead, Gavinski talked to other prisoners and failed to keep a direct view of Goodvine.  Goodvine then concealed himself behind his cell door and lacerated his arm for hours.

      10.    **March 20, 2014.**

On this date, Goodvine was on observation status with Officer Delmore assigned to monitor him.  Delmore failed to do so, and Goodvine cut himself.   When Goodvine told Delmore he was bleeding, Delmore responded that Goodvine was "garbage" and "trash," then he left.  Later, when Delmore told Kottka, Gerry and Exner that Goodvine was cutting himself, they, too, did nothing to intervene.

      11.    **August 17, 2014.**

On this date, Officer Wolf allegedly ignored Goodvine's repeated requests for observation placement.  Goodvine alleges that he "begged" for six to eight hours to be placed in observation, but Wolf did nothing.   Subsequently, Goodvine used a razor to cut his throat and left arm, requiring sutures and treatment at the local emergency room.

      12.    **August 20, 2014.**

On this date, Goodvine was on observation status and told Officer Fanara that he was having thoughts of self-harm.  When Goodvine asked to be put in restraints for his safety, Fanara declined, telling Goodvine to wait until third shift because he did not want to "deal with it."   Thereafter, Goodvine lacerated his right arm, causing injury and requiring sutures.

13.     **September 1, 2014.**

On this date, Goodvine told Officer Hooper that he had an "uncontrollable urge to self-harm" and asked to be placed in observation status.  Hooper told Goodvine to let him know "if it got worse."  Goodvine responded that there was "no worse."  Hooper still did nothing.  Goodvine then lacerated himself and was transported to the local emergency room for sutures.

D.     **Supplemental State Law Claims.**

Goodvine also seeks leave to proceed on Wisconsin negligence claims based on the above allegations.   The exercise of supplemental jurisdiction is appropriate when the state law claims are "so related" to the federal claims that "they form part of the same case or controversy." 28 U.S.C. § 1367(a).  In other words, where a district court has original jurisdiction over a civil action, such as a § 1983 claim, it also has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367(a), so long as the state claims "derive from a common nucleus of operative fact" with the original federal claims.  *Wisconsin v. Ho–Chunk Nation*, 512 F.3d 921, 936 (7th Cir. 2008).

Here, Goodvine's negligence claims stem from the same common nucleus of operative facts underlying his claims that defendants violated his rights under the Eighth Amendment.  Wisconsin negligence claims include the following four elements: (1) a breach of (2) a duty owed (3) causing (4) harm to the plaintiff.  *Paul v. Skemp*, 2001 WI

42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860.   Goodvine's allegations are sufficient to state a claim under this standard.

Therefore, the court will allow him to proceed on state-law claims against defendants Wall, Meisner, Dittman Hautamaki, Nickel, Weber, Morrison, Melby, Laurent, Wood, Buhr, Norge, Maier, Anderson, Ankarlo, Schwebke, Neumaier, Casiana, Schneider, Risen, Albright, Delmore, Fisher, Pitzen, Quade, Jordan, Kratz, Conroy, Gavinski, Miller, Gerry, Kottka, Exner, Wolf and Fanara based on the same allegations that support his Eighth Amendment claims against these defendants.


### E.      Retaliation.

Goodvine contends that Officer Conroy failed to protect him from self-harm on February 19, 2014, in retaliation for filing a previous lawsuit against him (*Goodvine v. Ankarlo*, 12-cv-134-wmc).   To state a claim for retaliation, a plaintiff must: (1) identify a constitutionally protected activity in which he was engaged; (2) identify one or more retaliatory actions taken by defendant that would likely deter a person of "ordinary firmness" from engaging in the protected activity in the future; and (3) allege sufficient facts that would make it plausible to infer that plaintiff's protected activity was a motivating factor in defendant's decision to take retaliatory action.   *Bridges v. Gilbert*, 557 F.3d 541, 555-56 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).

18

Prison officials may not retaliate against a prisoner for filing lawsuits against those officials. *See, e.g., Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002); *Babcock v. White*, 102 F.3d 267, 276 (7th Cir. 1996). Therefore, the court will allow Goodvine to proceed with a claim that Officer Conroy retaliated against him on February 19, 2014.

**F.      Remaining Claims and Defendants.**

Goodvine's complaint names several other defendants, but fails to include any allegations against them that would support a claim for relief. Accordingly, the complaint will be dismissed as to defendants Scanlan, Trinidad-Carillo, Bartz, Teska, Haag, Fabry, Judd, Hershberger, Stevens, Bednarek, LaPointe, Ashton, Roeker, Franson, Karna, the Bureau of Health Services, as well as the "Jane and John Doe" defendants.

ORDER

IT IS ORDERED that:

(1)     Plaintiff Christopher Goodvine's motion to consolidate Case Nos. 14-cv-278-wmc and 15-cv-146-wmc (dkt. #50) is GRANTED. These cases are consolidated pursuant to Fed. R. Civ. P. 42.

(2)     Plaintiff's motion for assistance in recruiting counsel (dkt. #51) is DENIED as premature.

(3)     Plaintiff's motion to stay (dkt. #53) is DENIED.

(4)     Plaintiff is GRANTED leave to proceed on the following claims:

        a.      Eighth Amendment and state negligence claims against defendants Edward Wall, Michael Meisner, Michael Dittman Hautamaki, Janel Nickel, Lucas Weber, Michael Morrison, David Melby, Dr. Laurent, Dr. Wood, Dr. Buhr,

Case: 3:14-cv-00278-wmc   Document #: 57   Filed: 03/31/16   Page 20 of 21

Dr. Norge, Dr. Maier, and Karen Anderson for failing to protect Goodvine from harm by implementing adequate policies and practices applicable to mentally ill inmates in segregation and failing to adequately supervise and train prison staff working with mentally ill inmates in segregation.

b.  Eighth Amendment and state negligence claims against defendants Ankarlo, Laurent, Wood, Buhr, Norge, Maier and Anderson for failing to provide Goodvine with adequate mental health care while he was in segregation.

c.  Eighth Amendment and state negligence claims against defendants Officers Schwebke, Neumaier, Casiana, Schneider, Risen, Albright, Delmore, Fisher, Pitzen, Quade, Jordan, Kratz, Conroy, Gavinski, Miller, Gerry, Kottka, Exner, Wolf and Fanara for failing to protect Goodvine from harm as specified in this opinion and order.

d.  First Amendment retaliation claim against defendant Conroy.

(5)  Plaintiff is DENIED leave to proceed on all other claims.  Defendants Scanlan, Trinidad-Carillo, Bartz, Teska, Haag, Fabry, Judd, Hershberger, Stevens, Bednarek, LaPointe, Ashton, Roeker, Franson, Karna, and the Bureau of Health Services, as well as "Jane and John Doe" defendants, are DISMISSED from this action.

(6)  Plaintiff has fourteen days (until April 13, 2016) to provide good grounds to proceed with his claims for specific injunctive relief as set forth above.

(7)  Pursuant to an informal service agreement between the Wisconsin Department of Justice and this court, copies of plaintiff's complaint and this order are being sent today to the Attorney General for service on the defendants.  Under the agreement, the Department of Justice will have 40 days from the date of the Notice of Electronic Filing in this order to answer, move or otherwise plead in response to plaintiff's complaint if it accepts service for the defendants.

(8)  Plaintiff must send the defendants' counsel a copy of every paper or document he files with the court.  The court will disregard any documents submitted by plaintiff unless plaintiff shows on the court's copy that he has sent a copy to the defendants or to defendants' attorney.

(9)  Plaintiff should keep a copy of all documents for his own files.  If plaintiff does not have access to a photocopy machine, he may send out identical handwritten or typed copies of his documents.

(10)    It is plaintiff's obligation to keep the court updated regarding his address.  If he fails to do this and defendants or the court are unable to locate him, his case may be dismissed for failure to prosecute.

Entered this 30th day of March, 2016.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge